**UNITED STATES of America**

v.

**Gilbert HOLLAND, a/k/a William Taylor.**

**Crim. A. No. 72–298.**

United States District Court,
E. D. Pennsylvania.

April 30, 1973.

Richard M. Meltzer, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Barney B. Welsh, Philadelphia, Pa., for defendant.

## MEMORANDUM

HUYETT, District Judge.

Defendant, Gilbert Holland, was found guilty by a jury on a one-count indictment charging him with knowingly and intentionally possessing with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a). He now moves for a judgment of acquittal pursuant to Fed.R.Crim.P. 29, or, in the alternative, for a new trial pursuant to Fed.R.Crim.P. 33. Eight grounds are raised by defendant in support of the motion for a new trial. We raised sua sponte the additional issue concerning prosecutorial questioning of the defendant's failure to inform the arresting governmental agents of an alibi defense.

The evidence against the defendant consisted primarily of the testimony of an undercover agent who bought heroin from the defendant. The transaction was arranged by an informer who was unavailable as a witness at the trial. While there were other agents on surveillance outside the house where the heroin sale took place, none of these surveillance agents were able to identify the defendant as the person they saw enter and leave the building about the time the sale was consummated. This was because of the darkness prevailing at the time of the sale and the distance the agents were stationed from the house. The purchasing agent was, however, certain in his identification of defendant as the person from whom he bought the heroin. Some nineteen days after the sale took place the purchasing agent met by chance with the defendant, who had not yet been arrested. This meeting gave the agent an opportunity to observe the car driven by the defendant and to record the car's license plate number. With this information the governmental agents were able to identify the defendant's true name and to effect his arrest some three weeks later.

The defendant took the stand in his own defense. On direct examination the defendant denied that he had ever dealt with narcotics and stated that on the day in question he was working. During the specific time the sale took place the defendant testified that he was at a truck stop fixing a leased truck he uses to deliver steel and other products. Defendant further testified that he went to the truck stop after having made deliveries with his leased truck continuously from 4:00 P.M. the day before the sale of the narcotics took place until 6:00 P.M. of the day of the sale; and that working with him at the truck stop were mechanics whose full names he could not recall. He remembered only that the first name of one mechanic was "Mike". The defendant did, however, recall the name of at least one other person who was present at the truck stop when the defendant was there. None of these persons testified at the trial. The defendant also testified that when he

was arrested he denied the charges against him.

On cross-examination the prosecutor asked the following questions:

"On April 19, 1972, at the time of your arrest did you tell the agents what you were doing on March 10, 1972 as you have testified here today?"

"And during that time [after arrest and during questioning by the agents] you are saying that you did not have an opportunity to tell your story to the agents?"

"Did you have an opportunity to speak to the agents to tell them what you were doing on March 10, 1972?"

"So you were told of the charges. Now, did you tell the agents what you are telling us today?"

"When Agent Henrich came to visit you in Dallas, did you tell him that you were working on March 10th and you were not near the vicinity of 25th and Wharton?" [1]

None of these questions were objected to by defense counsel. The prosecutor's summation to the jury only obliquely refers to the defendant's ability at trial,

1. The verbatim questions and answers are as follows:

"On April 19, 1972, at the time of your arrest did you tell the agents what you were doing on March 10, 1972 as you have testified here today?

"Mr. Meltzer, to be honest with you, I didn't have a chance to even explain nothing. They just grabbed me out. They grabbed me up and they throwed me in jail and forgot about me. I didn't have no time to locate anybody. I couldn't do nothing. I couldn't even get ahold of a lawyer.

"How long did the interview take place on April 19th? You have heard Agent Compton say it took place over a period of two hours or so; is that correct?

"Mr. Meltzer, it was longer than that.

"Three hours; is that correct?

"I arrived there—I must have arrived there about 5:30 in the evening." (N. T. pgs. 296–297)

*     *     *     *     *

"And during that time you are saying that you did not have an opportunity to tell your story to the agents?

"To tell my story?

"Yes, did they give you an opportunity to speak?"

[This question was not responded to] (N.T. pgs. 297–298)

*     *     *     *     *

"Did you have an opportunity to speak to the agents to tell them what you were doing on March 10, 1972?

"Mr. Meltzer, they never asked me.

"They never asked you?

"They never asked me.

"Did they tell you what you were charged with?

"At first they didn't sir. The gentleman that told me what I was charged with I believe was the supervisor. He was the one who was harsh. He told me I had a quarter of a million dollar bail and then a $150,000 bail.

"When Agent Compton testified yesterday he said he told you the details of the offense with which you were being charged; is that correct?

"Excuse me, I don't remember that man. I can't remember even seeing that man.

"You don't recall seeing him?

"No, sir.

"Do you recall ever being told about the details of the offense with which you were being charged?

"Of course.

"So you were told about March 10, 1972?

"About the charges?

"Yes." (N.T. pgs. 298–299)

*     *     *     *     *

"Well, we'll get to that. So you were told of the charges. Now, did you tell the agents what you are telling us today?

"By me driving?" (N.T. pg. 301)

*     *     *     *     *

"When Agent Henrich came to visit you in Dallas, did you tell him that you were working on March 10th and you were not near the vicinity of 25th and Wharton?

"Mr. Meltzer, I can't remember. The only thing Mr. Henrich was—as a matter of fact, he wasn't telling me anything. He was asking me questions. He showed me a series of pictures. He had a bunch of pictures he was showing me and he also showed me photostatic copies of the papers that he took from me from my truck; the truck which I operate. He showed me names there of companies, names of people that I have worked for. He said he would make copies of these because they're very important people, and I don't understand. It was names of people from time, from Hammond, Indiana. Places of this sort, companies—excuse me, sir, I am sorry." (N.T. pgs. 303–304)

but inability during the two-week period after arrest, to recall where he was on the day of the sale.[2]

Defendant contends that prosecutorial questioning concerning defendant's failure to tell the arresting agents of his alibi defense to the crime for which he was charged violates his Fifth Amendment right not to "be compelled in any criminal case to be a witness against himself." We agree.

Recently, in United States ex rel. Burt v. New Jersey, 475 F.2d 234 (3 Cir. filed March 13, 1973) the Third Circuit Court of Appeals held that a defendant's Fifth Amendment right was not violated by prosecutorial questioning concerning the defendant's failure, up to and after the time the defendant was arrested for an unrelated crime, to inform anyone, including the police, that the defendant had accidentally shot a friend. The Court reasoned that the defendant's failure to seek aid for his friend or to tell anyone of the incident, including the police, was inconsistent with his trial testimony that the shooting was an accident. Relying on Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), which held that statements by an accused that were illegal because the police failed to give *Miranda* warnings prior to interrogation could be used to impeach the defendant when he took the stand in his own defense, the *Burt* court held in a per curiam opinion that the inconsistent conduct of failing to tell the police of the accidental shooting could be laid before the jury for the purpose of impeaching the defendant's trial testimony. The court reasoned that because the defendant had been arrested for a crime unrelated to that about which the

prosecutorial questioning concerned there did not exist any Fifth Amendment compulsion concerning the charges arising out of the shooting. Thus, "[t]here was no reason for [Burt] not to comment on the allegedly accidental shooting."

The concurring opinion in *Burt,* however, concedes that Burt's failure to inform the police that he had accidentally shot a friend when arrested on an unrelated charge and after he was suspected of the shooting "may also be interpreted as an exercise of his right not to incriminate himself." Nevertheless, the concurrence reasons on the basis of *Harris* that the conduct can be laid before the jury, and the defendant is then given the opportunity to explain away seeming inconsistencies. The concurrence further reasons that allowing the constitutionally protected conduct to be used to impeach does not violate Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). *Griffin* held that because adverse prosecutorial comment or judicial instructions on the failure to take the stand makes costly this exercise of the right against self-incrimination, such statements made to a jury are unconstitutional. The *Burt* concurrence states: "I do not see that *Griffin* applies to a situation where a defendant takes the stand and his credibility is tested by prior inconsistent conduct." United States ex rel. Burt v. New Jersey, 475 F.2d *supra,* at 238. The concurrence reasons that putting a cost on the exercise of constitutional conduct does not end the inquiry whether the cost exacted constitutes a constitutional deprivation. In analyzing *Griffin* the *Burt* concurrence states that the "cost was *great enough* to compel some de-

---

2. The prosecutor's comments were as follows:
   "Let us examine his claim that he wasn't in the vicinity on March 10th because he was working. Examine it. Does it make sense. He recalls now that on March 9th he went up to Syracuse, and late that afternoon, around four o'clock, he began the ten-hour drive back to Philadelphia in his truck." (Partial transcript, p. 17)

"The Defendant was arrested April 19th. He claims now he recalls where he was on March 10th. If he recalls it now, he must have certainly recalled it on April 19th. He claims he even told the agents that time where he was." (Partial transcript, p. 18)
[The latter statement by the prosecutor is not supported by any evidence in the record.]

fendant to take the stand and testify." *Id.* at 239. (emphasis added) In *Burt* the cost was not so great as to compel a person to relinquish his Fifth Amendment privilege to remain silent because the defendant had not been questioned by the police concerning the shooting.

A different panel of the Third Circuit from that which decided *Burt* has, however, taken a more stringent view of *Griffin*. In United States ex rel. Macon v. Yeager, 476 F.2d 613 (3 Cir. filed March 30, 1973) the court states: "*Griffin* holds broadly that, at least in the criminal context, the relevant question is whether the particular *defendant* has been *harmed* by the state's use of the fact that he engaged in constitutionally protected conduct, not whether, for the particular defendant or for persons generally, the state's reference to such activity has or will *burden* the exercise of the constitutional *right*." United States ex rel. Macon v. Yeager, 476 F.2d at 616. (emphasis in original) In *Macon* the court held that a defendant's right to counsel was violated when the prosecution was permitted to comment on the defendant's consulting with a lawyer the day after an alleged accidental shooting. It should be noted that in *Macon* the defendant took the stand and testified that he had consulted with a lawyer the day after the accident.

Assuming that the concurrence in *Burt* is correct in its analysis of *Griffin*, it is clear that in the case before us the defendant's Fifth Amendment right was violated when the prosecution was allowed to question the defendant on the defendant's silence in the face of charges made against him. Unlike *Burt* the defendant in this case was exercising his privilege in the face of police interrogation concerning the charges lodged against him.

*Harris* does not hold differently. *But see* United States v. Ramirez, 441 F.2d 950 (5 Cir.) cert. denied, 404 U.S. 869, 92 S.Ct. 91, 30 L.Ed.2d 113 (1971). *Harris* was concerned with "how broad a sanction is necessary to vindicate the *Miranda* procedural requirement that an arrested suspect must be advised of his right to counsel before he shall be interrogated." United States v. Hockenberry, 474 F.2d 247 at p. 250 (3 Cir., filed February 21, 1973). The Court concluded in *Harris* that "sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." *Id.* at 225 of 401 U. S., at 645 of 91 S.Ct. Furthermore, the Court stated that "the benefits of this process [the impeachment process] should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby." *Id.* The Court then went on to determine that the impeachment use of illegally obtained statements does not cut down the criminal defendant's privilege "to testify in his own defense, or to refuse to do so . . . [because] *that* privilege cannot be construed to include the right to commit perjury." *Id.* (emphasis added)

In the case before us we are not concerned with whether the benefits of the impeachment process should or should not be lost in order to deter impermissible police conduct. Nor are we concerned only with the privilege to testify in one's own defense, or to refuse to do so. Rather, we are concerned with a more fundamental question whether the exercise by an accused of the right to remain silent in the face of criminal accusations by the police can be used to impeach. To conclude as we do that impeachment by silence in the face of criminal accusations deprives the defendant of his constitutional right against self-incrimination does not invoke an attempt either to regulate or to fail to regulate impermissible police conduct; it is merely an effort to give meaning to the Fifth Amendment right. And insofar as the Supreme Court has decided that the privilege to testify in one's own defense or not to so testify does not include the right to commit perjury, we do not believe that that decision implicates the right to remain silent in the face of criminal accusations. As to the latter right *Griffin* requires a

finding that the prosecutorial comment in this case violated the defendant's Fifth Amendment right not to be compelled to be a witness against himself. See also Johnson v. Patterson, 475 F.2d 1066 (10 Cir. 1973). (*Griffin* violated when prosecution questioned rape defendant's failure to inform arresting officers that victim consented).

■ Having concluded that constitutional error existed as a result of the prosecutorial questioning and comment, we must consider whether the error was harmless. See Anderson v. Nelson, 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968) reh. denied, 391 U.S. 929, 88 S. Ct. 1812, 20 L.Ed.2d 670 (1969); United States v. Tillman, 470 F.2d 142 (3 Cir. 1972). *Anderson* found comment on a defendant's silence to be prejudicial where the comment was extensive, where an inference of guilt from silence was stressed to the jury as a basis for conviction, and where there was evidence that could have supported acquittal. Although the comment in this case may arguably be considered extensive, *compare* United States v. Tillman, *supra* (comment consisting of three sentences) *with* Anderson v. Nelson, *supra* (comment covering two pages of the Supreme Court Reporter), the comment was not direct comment to the jury. Nor was the comment stressed to the jury as a basis for conviction. The prosecutor in his closing speech made only oblique references to defendant's conduct at arrest. These references are more fairly characterized as attempts to lessen the credibility of the defendant's story as related by the defendant on the stand. The prosecutor merely stressed that if the defendant had an alibi he should make efforts to support the alibi other than by his own self-serving statements from the stand. Finally, the only evidence supporting acquittal was the defendant's own testimony. The defendant was the only witness to testify in his defense. And his credibility was severely undermined by a government rebuttal witness who testified that the defendant had frequently sold the witness narcotics. For these reasons, we conclude that the prosecutorial questioning and comment was harmless error.

■ A number of some other points raised by the defendant in support of his motion for a new trial require discussion. The purchasing agent was permitted to testify that after he saw the defendant on the occasion after the sale, the agent attempted to identify through police photographs the correct identity of the person who had sold him the heroin. This was the only mention of police photographs made by the agent. United States v. Reed, 376 F.2d 226 (7 Cir. 1967) does not stand for the proposition, as defendant contends, that mere mention of police photographs constitutes error. In *Reed* the use of constant reference to defendant's "mug shots" was held to constitute placing the defendant's prison record before the jury. The mere mention on one occasion to police photographs did not result in converting the trial of a presumed innocent man into the trial of a known convict as was the case in *Reed*. The jury could not have seriously inferred by the reference to police photographs that defendant had a prison record.

■ Defendant contends that we erred in foreclosing a defense that defendant was an agent for the buyer (the government agent). This defense, recognized by some courts under prior legislation, see Lewis v. United States, 119 U.S.App.D.C. 145, 337 F.2d 541 (1964), has been legislatively abolished by the Comprehensive Drug Abuse Prevention and Control Act of 1970.

■■ Finally, defendant was properly impeached by testimony of a rebuttal witness. The witness testified that the defendant had sold narcotics to the witness on various occasions. This testimony was in direct contradiction to defendant's testimony that he had never dealt in narcotics. Furthermore, our charge on impeachment was not excepted to by the defense and cannot now be raised as

**914**

a grounds for new trial. Fed.R.Crim.P. 30.

Thus, for the reasons stated in this Memorandum, we denied the motions for a new trial or for judgment of acquittal by Order of March 23, 1973.